## LOUISA C. E. BERRY ET AL. vs. THE SAFE DEPOSIT AND TRUST CO. OF BALTIMORE, EXECUTOR.

*Wills—Testamentary Capacity—Legal Sufficiency of Evidence of Incapacity—Testimony of Medical Experts When Not Admissible—Evidence.*

A man who has mental capacity enough to make an ordinary contract or deed has sufficient capacity to make a will; and the question whether he has that degree of capacity is to be determined by a consideration of his external acts and appearances.

Upon the trial of a caveat to a will attacked upon the ground of the testator's mental incapacity at the time of its execution, the evidence showed clearly that at that time the testator exhibited judgment and understanding and exact knowledge as to the amount and situation of his property and in reference to the relative claims of different persons who should have been the objects of his bounty, and that on the day the will was signed the testator made contracts affecting nearly half of his estate. The contestants offered evidence to show that since the death of testator's wife about sixteen months before the will was made he became depressed and failed physically, his walk degenerating into a shuffling gait; that many years before he had been an excessive smoker, etc. *Held*, upon the facts of the case, that none of these disconnected incidents in the life of the testator had any probative force to show that he was not mentally competent at the time the will was executed and that consequently the jury was properly instructed to return a verdict for the defendant.

When there is strong evidence to show that the testator was mentally competent and the evidence adduced to show that he was incompetent relates to matters not obscure or requiring explanation by a physician and is so slight and inconclusive that the Court rules as matter of law that the jury cannot infer from it that the testator was incompetent then the testimony of a medical expert, who did not personally know the testator, is not admissible to show that he draws a different conclusion from such evidence and that according to his method of reasoning these circumstances do indicate mental incapacity.

Medical experts are no better qualified to draw correct inferences from every day transactions and non-scientific premises than is the ordinary man of average common sense.

If the evidence shows that a testator was afflicted with a mental disease, the testimony of a medical expert is competent to show the effect of the disease upon the intellectual faculties ; or if the testator's condition was obscure or the circumstances of the case such that neither judge nor jury can arrive at a correct conclusion without technical aid, then also the testimony of an expert is admissible.

When the question of a person's sanity is in issue, evidence to show that other members of his family had been afflicted with mental derangement is not admissible unless a foundation be laid for it by evidence tending to prove the insanity of the person whose mental condition is under investigation.

When the attending physician has testified that the testator had had a fall which shocked his nervous system, he may be asked on cross-examination whether that shock in any way impaired testator's mind.

The fact that the testator made a mistake in multiplying a set of figures no more proves an inability to make a valid contract or will than would a mistake in spelling or in grammar.

If evidence has been admitted to show that the testator did make an error in multiplication, it may be rebutted by evidence that he multiplied other figures correctly.

No declaration made by an executor before his qualification can be received against him as the representative of the estate or bind legatees or creditors.      .

Upon the trial of a caveat to a will where the issues related to testator's capacity and knowledge of the contents of the will, the vice-president of the corporation which was the executor was called as a witness by the caveators and asked whether he had not threatened some one connected with the prosecution of the caveat that in the event of the will being sustained he would take away the bequests made to the caveators by the testator. *Held,* that the question was not competent, because not relevant to the issues and insufficient as a foundation for impeaching the credibility of the witness.

Appeal from the Court of Common Pleas of Baltimore City (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*William S. Bryan, Jr.,* and *William L. Marbury,* for the appellants.

*Wm. Pinkney Whyte* and *Edgar H. Gans* (with whom was *Charles E. Hill* on the brief), for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

This protracted litigation involving the validity of the last will and testament of the late George R. Berry is before us for the third time. The first appeal is reported in *93 Md. 240,* and the second in the same volume *p. 560.* The pending appeal was taken by the plaintiffs, who are the caveators, the others were brought here by the defendant, the executor. The present record contains thirty-four bills of exception. Some of them relate to rulings on the admissibility of evidence, and the last one concerns rulings on the prayers presented by the defendant and granted by the Court at the conclusion of the plaintiff's evidence. Those prayers instructed the jury to return a verdict for the defendant upon the ground that there

had been adduced no legally sufficient evidence to support the issues before the jury. It will be necessary in considering the various questions which arise to understand the precise situation of the case, and, therefore, that will be briefly stated.

Upon the filing of the caveat there were six issues framed and sent to a Court of law for trial. The proceedings were instituted by collateral kindred, the testator having left no direct descendants. The issues were in substance, as follows : The *first* relates to mental capacity ; the *second,* to knowledge of the contents of the will ; the *third* to its execution; the *fourth* to undue influence ; the *fifth* to fraud in its procurement, and the *sixth* is as to whether the will is the testator's last will. After the rulings complained of on the former appeal had been reversed and the record had been remanded for a new trial the case was removed from the Superior Court to the Court of Common Pleas. When the jury had been impaneled in the latter Court they were instructed by the trial Judge to find, and they did find, in favor of the defendant on the *third, fourth, fifth* and *sixth* issues. The *first* and *second* issues were thus left open and upon them the parties went to trial. It will be observed that as the case is now presented it is a case where a verdict has been rendered, finally determining that the assailed will was executed in accordance with the formal requirements of the statute ; that there was no undue influence practiced upon the testator ; that the will had not been procured by fraud, and, fourthly, that the contested paper was the last will and testament of George R. Berry. With those findings of record at the beginning of the case and with the inquiry before the jury narrowed to the two questions as to whether the testator was possessed of sufficient mental capacity to enable him to make a valid·deed or contract, and, secondly, as to whether he was aware of the contents of the paper which he signed, the plaintiffs not only offered the same evidence which they had adduced on the former trial, but much of that which had been presented by the defendant ; and they then called several medical experts to the stand and offered to propound hypothetical questions to them, but those questions

were excluded upon grounds that will be stated and considered later on. The defendant put in no evidence.

The predominant question as the case is presented, though it is the last one raised on the record, is this: Was there any legally sufficient evidence, apart from the proffered and excluded expert testimony, from which a jury could rationally find that the testator was not mentally capable of making a valid will? Now, what is the degree of mental capacity which the law requires in such a case? We are not dealing with a question of sanity or insanity. Whatever that mysterious malady called insanity may be, according to the theories of speculative specialists, the law, in the administration of justice both in civil and criminal proceedings, has its own standards of mental capacity and responsibility, and to those standards judicial tribunals must look and by them they must be governed, when dealing with questions of the character now before us. By the legal standard he who is possessed of sufficient capacity at the time of executing his will to make a disposition of his estate with judgment and understanding in reference to the amount and situation of his property and the relative claims of the different persons who should have been the objects of his bounty, is mentally competent to make a valid will. *Davis* v. *Calvert*, 5 G. & J. 269; *Jones* v. *Collins*, 94 Md. 408. In a word, if he has capacity enough to make a valid deed of conveyance or an ordinary contract, then he has capacity enough to make a valid will. This standard is plain, simple and intelligible, precisely as is the law's standard of criminal responsibility, viz., the ability to distinguish between right and wrong, and not the vague, indefinite and speculative theories of alienists who undertake to measure accountability for crime in a totally different way. *Spencer* v. *State*, 69 Md. 28. The mental condition of an individual, whatever the cause of that condition may be, is manifested by external acts and appearances and in no other way. Is there in the record any evidence of external acts and appearances from which a jury could rationally draw the conclusion that on the day George R. Berry made his will he did not possess sufficient

mental capacity to make a disposition of his estate with judgment and understanding in reference to the amount and situation of his property and the relative claims of the different persons who should have been the objects of his bounty? Let us see what manner of man he was and what he did.

George R. Berry made and executed his will on the tenth day of February, eighteen hundred and ninety-nine, and died on March the ninteenth, following. His estate according to the inventories filed by the executor, amounted to something over seventy-three thousand dollars. The will contains thirty-six bequests besides a residuary clause, and goes into the most minute details with respect to much of his property. To his own relations he gave sundry sums aggregating nine thousand, two hundred dollars. To the relations of his deceased wife he gave altogether twenty thousand, five hundred dollars. To friends of his wife and to his own friends he gave nine thousand dollars. To his servants he gave forty-three hundred dollars. To the Boys' Home he gave fifteen hundred dollars. To the Home of the Aged, two thousand dollars, and to the Woman's College the residue of his estate.

At the time of his death Mr. Berry was seventy-eight years and four months of age. He had been an active, energetic and successful business man. He had held positions of trust and responsibility, both public and private. He had been a member of the General Assembly of Maryland and of the City Council of Baltimore, and a director of the Baltimore and Ohio Railroad Company, of the Maryland Penitentiary and of the Fireman's Insurance Company, besides having served on the grand jury probably more frequently than any other individual in Baltimore. There is no pretence that he was not perfectly competent to transact business or to make a valid deed or contract up to the date of the death of his second wife. Physically he had been a hale and vigorous man. But it is alleged a change came over him upon the death of his wife in November, eighteen hundred and ninety-seven; and it is from that event it is asserted his mental faculties began to fail. There is no doubt this calamity greatly depressed him. We

said in the former appeal, "but if the question were before us
to be determined on the evidence in the record, we feel bound
to say that we see nothing in all that has been testified to, to
indicate that this great sorrow or any other cause seriously
impaired his intellect or deprived him of the capacity to make
a valid will." The will in contest was not the first he had
made. During the life of his wife he had signed a will wherein
many of the legatees named in the caveated paper were pro-
vided for, and wherein the Woman's College was also made
residuary legatee. After the death of his wife he executed
other wills; "and the record shows in all these instances that
he acted with particularity, circumspection and intelligence."
On the former appeal we said and we now repeat: "If there
ever was a will made with deliberation and after careful prepa-
ration, the evidence, if worthy of credence at all, shows that
the will of February the tenth, was so made." As the case
is now before us on the legal sufficiency of the plaintiff's evi-
dence we will transcribe at length the only testimony con-
tained in the record on the subject of the preparation and the
execution of the will.

The will was prepared by Mr. John W. Marshall, second
vice-president of the Safe Deposit and Trust Company, and
the following is what Mr. Marshall, when called as a witness
by the plaintiffs, deposed to. "I prepared a will for Mr. Berry
in 1896, then one in the spring of 1898, then a codicil in the
fall of 1898, then the final will of 1899. Witness stated that
the classification from which he got the Uthman children who
were legatees was handed him on February 6th, 1899, by Mr.
Berry. It was a list of legacies by which I was to be guided
in the preparation of the will and the order in which they
should be inserted in the will. It was not in the handwriting
of Mr. Berry but was in the handwriting of Mattie Loney, his
chambermaid. At the time Mr. Berry gave me this classifica-
tion, he also gave me the old will of 1898 with the codicil
attached, together with various sheets of paper upon which he
had written the new legacies to be inserted in the will, which
he contemplated having prepared. Mr. Berry handed me on

February 6th, 1899, for the purpose of preparing his will," the will which was executed on the tenth, "a classification in Mattie Loney's handwriting, in which the legacies were arranged in a certain order, his old will of 1898, with memoranda on it in his handwriting, noting precisely, what changes were to be made, and separate memorandum, in his own handwriting, showing the new legacies. These papers were returned to Mr. Berry with his new will and have not since been found. On the old will of 1898 Mr. Berry noted the changes in the legacies in his own handwriting; there was no change in the will of 1898 and the present legacies to William J. Berry or Louisa C. E. Berry or Emily H. Berry or John H. Morrow, nor Iza May Berry nor Lucy C. Dorsey; the legacy to Dr. Donavin in the old will was marked out, and new legacies were left to the daughters of Dr. Donavin, Lucretia B. Donavin and Virginia Donavin, in the will in controversy. The trust clauses were new, all in Mr. Berry's handwriting. On a separate piece of paper, in Mr. Berry's handwriting, was a bequest to our company of fifteen hundred dollars for John Hamilton Walker, the oldest of the Walker children. A memorandum under that, ditto, as to Georgie O. Walker; ditto, for Martha G. Walker, and ditto, for Sarah P. Walker, and ditto for Uthman Walker. I consolidated them into one item." These Walker children were the children of Lucretia Osborne Walker, a niece of the testator. "The mistake spoken of, in reference to the five hundred dollars for the fifteen hundred dollars for Uthman Walker was in the Mattie Loney classification." The witness was here explaining that in the classification of legacies made out in the handwriting of Mattie Loney an error occurred in this, that she wrote opposite Uthman Walker's name the sum of five hundred dollars; but on the paper which was in Mr. Berry's handwriting that error did not appear, because there the correct sum, fifteen hundred dollars, was given. The witness then proceeded: "The legacy to Mr. Wilkinson in the old will was the same in the present, and many minor legacies were the same in both, such as the legacy to Miss Pindell, and the legacy to Miss

Margaret Young. The residuary clause was the same in both wills. I did not help Mr. Berry make his will other than put together the data which he gave me in the draft of the will which he executed on February 10th, 1899, at the office of the Safe Deposit and Trust Company in the presence of Andrew G. Spamer, J. William Marshall and myself." In November, 1897, Mr. Berry drew up and signed a paper certifying that he had made certain provisions in his will. That will has not been found. On the back of that certificate he endorsed the following memorandum: "This is to certify that I have cancelled all former wills made by me and substituted in their stead the one dated February 10th, 1899, as my last will and testament, in which I bequeathed to Lucretia Berry Walker, my wife's namesake, the sum of $2,000; I. Hamilton Walker, the sum of $1,500; Georgie O. Walker the sum of $1,500; Martha G. Walker, the sum of $1,500; Sarah P. Walker, the sum of $1,500; Uthman Walker, the sum of $1,500. George R. Berry." The figures named in this certificate tally precisely with those set forth in the will of February the tenth. On the twenty-third of January, 1899, or eighteen days before the will was signed Mr. Berry made out in his own handwriting a complete inventory of all his real and personal estate, affixing to the various shares of stock and to the bonds which he owned their then market value and putting upon the real estate and the contents of his dwelling house estimated values. Included in this inventory were two hundred and fifty shares of City Passenger Railway stock and two hundred and fifty-two shares of Consolidated Railway stock. These five hundred and two shares of stock he sold on February the tenth, after making his will and received therefor the sum of thirty-one thousand, nine hundred and fifty dollars which was deposited to his credit with the Mercantile Trust and Deposit Company. This transaction involved about three-sevenths of the testator's estate and it has not been suggested by any one connected with it that Mr. Berry was incapable of making it. The fact is he did make it.

Against all this overwhelming evidence showing in the

most positive manner that George R. Berry exhibited on February the tenth, 1899, judgment and understanding as well as exact knowledge in reference to the amount and situation of his property and in reference to the relative claims of the different persons who should have been the objects of his bounty, to say nothing of the strong indications in the same direction which the numerous provisions of the will itself furnish, the plaintiffs adduced a number of independent and disconnected incidents in the life of the testator, that had occurred both before and after the execution of the will, with a view of showing that *at the time* he made the will he was mentally incapable of making a valid one. Nearly all of those incidents were before this Court on the former appeal. They were then discussed and excluded as the bases for hypothetical questions. It would be a wearisome task to go over all of them again. They are trivial, insignificant and of no probative value as respects the testator's mental capacity on February the tenth, 1899, when the will was made ; and they are utterly insufficient to overthrow the plaintiff's own affirmative proof establishing that capacity. It is not pretended that George R. Berry was permanently insane. Even if the incidents alluded to had a tendency to show that at times owing to transient causes, his mental faculties were clouded, they did not show a permanent impairment, far less did they show any impairment, *at the time* the will was executed. Some of the more prominent of these incidents will now be mentioned and they will serve as illustrations of all. Thus, it was shown that Mr. Berry had been addicted to excessive smoking, but that was thirty years before the will was made. Even had the habit been contemporaneous with the making of the will it would have proved nothing. Would any Court permit a jury to infer that a man was mentally incapable of making a will because he smoked fifteen cigars a day ? It was also proved by three witnesses that Mr. Berry many years ago and frequently in later years had stated that his grandfather, Charles Constable, borrowed half a million of dollars in his lumber business from Robert Oliver and that this was in the first half

of the last century.    The record contains evidence that Charles
Constable did borrow money from Robert Oliver.    Certified
copies of the accounts in the estate of Robert Oliver de-
ceased show that on December 31st, 1834, there was due to
Oliver's estate by Charles Constable $15,587.70.    How much
more Constable had borrowed does not appear.    Nor does it
appear from what source Mr. Berry got the impression that
so large a sum as one-half million of dollars had been loaned
to his grandfather.    Had he been told so?    Or, did he sim-
ply imagine it?    It has not been shown that it was a delu-
sion—that he believed it to be true in spite of evidence which
should have convinced him that it was a fiction.    Without
anything to indicate whether Mr. Berry merely repeated what
he had heard, or whether he imagined the whole story, or
was simply mistaken as to the event, a jury would not have
been justified in concluding that this incident indicated a want
of testamentary capacity, especially when the incident itself
had no relation to the will or to the making of the will.    In
1896 Mr. Berry said in the presence of several persons that
he had given his house on Eutaw Place to his wife, "that he
believed in being honest in everything, that he had given his
Eutaw Place house to his wife and that if he went to the bank
tomorrow to borrow any money he would certainly tell them
he had given her the house before he secured the loan."    His
wife was then living.    When Mr. Berry died the title to the
house stood in his own name.    There is no evidence to show
that he had not given her the house.    She may have held an
unrecorded deed for it—there is nothing to indicate that she
did not.    Could a jury be permitted to guess that she did not
and then to infer from that guess that in 1896 Mr. Berry was
laboring under a delusion with respect to the ownership of a
portion of his property?

It is true that after the death of his wife in November, 1897,
he failed physically.    His walk became less elastic and de-
generated into a shuffling gait; but can a jury be allowed to
say from that circumstance that he no longer possessed the
requisite capacity to make a will?    "Neither age, nor sick-

ness, nor extreme distress, nor debility of body will affect the capacity to make a will if sufficient intelligence remains." *Higgins* v. *Carlton*, 28 Md. 115. One of the witnesses was asked whether in November, 1898, Mr. Berry's manner impressed the witness as being silly. There was no foundation laid for such an inquiry even if it had been competent in any event. It was the mere, naked opinion of the witness which was asked for, and it would be exceedingly dangerous to allow such opinions to go to a jury. Such evidence is open to many objections. It is not the statement of a fact but simply the impression of the witness which there is no means of controverting. If a witness should swear falsely as to an impression it would be impossible to convict him of perjury because there would be no method by which the falsity of the statement could be shown. It is very easy to say of a dead man that at some period in his life he impressed a witness as being silly, and if the validity of wills is made dependent on such impressions it would not be difficult to vacate any will. Nor can the fact that a testator has made a disposition different from the one he antecedently stated he would make be treated as evidence of his inability to make a valid deed or contract.

Not one of the various incidents contained in the record tended to show that Mr. Berry had not the requisite mental capacity to make a valid will at the time he did make his will. Can it be possible that a combination of all of those incidents will establish a conclusion which no one of them tends to prove? The sum of any number of zeros will always be zero, and this is true in the law of evidence as well as in arithmetic. You may combine as many independent circumstances as you please, and if no one of them has any legal tendency to establish the fact to be proved then all of them taken together can have no greater probative value. If each proves nothing, all can prove no more. To assert the contrary is to state that the aggregation of a number of incompetent facts is, by force of that mere aggregation, sufficient to establish a result which no one of the same facts considered by itself has even the remotest tendency to prove. *An. & Balto. Short L. R. R.*

*Co.* v. *Pumphrey*, 72 Md. 87. This must be distinguished from the other proposition, that a fact which *tends* to prove the issue, though in itself slight and if standing alone insufficient to establish it, is still admissible.

With positive, direct and unequivocal evidence adduced by the plaintiffs themselves and showing conclusively that George R. Berry when he made out the memoranda for his will and afterwards when he signed that will fully and accurately knew what property he had and that he intelligently selected the persons he wished to be his beneficiaries, and further showing that on the very day he executed the will he concluded contracts affecting three-sevenths of his entire estate, no jury could rationally have inferred from the collateral circumstances alluded to and which were not coincident with the making of the will and threw no light upon his mental condition *at that time*, that he was, when he signed the will, unable to make a valid deed or contract. It was, therefore, the clear duty of the Court to withdraw the case from the consideration of the jury and its ruling to that effect in the *thirty-third* bill of exceptions was right, unless the plaintiffs were entitled to have had the medical experts express their opinions on the facts in evidence. And this brings us to the inquiry: Was the Court right in refusing to allow the medical experts to draw inferences from the circumstances testified to by the other witnesses, when obviously those circumstances were insufficient, in the judgment of the Court, to warrant a conclusion that the testator was devoid of a testamentary capacity at the time the will was made?

We need not repeat what was said on the former appeal with respect to the danger of inflicting great wrong in the trial of contested will cases, if much reliance is placed on the opinions of medical experts who personally know nothing about the mental capacity of a testator and who substitute for that ignorance mere conjectures and inferences, often most illogical and absurd. But fortunately for the cause of justice it is not every will case that presents an opportunity for these medical experts to ventilate their theories. The precise situation with which

we have to deal now is this : Given, a case where the contestants have themselves conclusively proved that the testator was at the time he signed and published his will fully competent to make a valid deed or contract ; and given, certain other circumstances which are neither medical nor obscure and need no interpretation or explanation by a physician and which relate to other periods of time ; and given, the further fact that these circumstances furnish in the opinion of a Judge no foundation for an inference that the testator was incompetent to make a will when he did make it ; can a medical expert be put upon the stand to draw a different conclusion and to say that in *his* judgment and according to *his* method of reasoning those circumstances *do* indicate mental incapacity ? If this can be done the medical expert at once usurps the province of the Judge whose duty it is to decide upon the legal sufficiency of evidence, and such a decision always involves a determination as to whether the circumstances are susceptible of sustaining a particular inference. Can a medical expert reason any more accurately or logically than an individual who is not a medical expert ? The duty of the Court is clear. " But the *legal sufficiency* of the evidence adduced to sustain the issue or to establish any particular fact material to its determination, is a question of law and not of fact ; and wherever it is so light and inconclusive that no rational, well-constructed mind can infer from it the fact which it is offered to establish, it is the duty of the Court, when applied to for the purpose, to instruct the jury that there is no evidence before them to warrant their finding the fact thus attempted to be proved.   *   *   *   *
The exercise of this power by the Courts, as was said by JUDGE DORSEY in *Cole* v. *Hebb,* 7 G. & J. 41, ' is no infringement of the sage axiom of the common law *ad questiones juris respondent judices, ad questiones facti respondent juratores;* it is coeval with the institution of the trial by jury ; is the balance wheel of the machine by which their powers are exerted—a check, a safeguard placed around them to prevent the *abuse* and not the *use* of their authority. It is in fact, both in practice and theory, the great conservative principle of our juris-

prudence as respects the trial by jury.'" *Clarke* v. *Dederick*, 31 Md. 150. The tendency of the medical expert to involve in mystery the simplest unscientific facts and to cloud them in bewildering technical nomenclature and then to deduce most irrelevant conclusions from them, is notorious and is frequently exhibited in trials at *nisi prius*; and it is consequently apparent that these medical experts are no better qualified to draw correct inferences from every-day transactions and non-scientific premises than is the ordinary man of average common sense. "These doctors," said the Supreme Court of Illinois a few years ago, "were summoned by the contestants as 'experts' for the purpose of invalidating a will deliberately made by a man quite as competent as either of them to do such an act; they were the contestants' witnesses and so considered themselves. The testimony of such is worth but little, and should always be received by juries and Courts with great caution. It was said by a distinguished Judge, in a case before him, if there was any kind of testimony not only of no value, but even worse than that, it was, in his judgment, that of medical experts. They may be able to state the diagnosis of the disease more learnedly, but, upon the question whether it had, at a given time, reached such a stage that the subject of it was incapable of making a contract, or irresponsible for his acts, the opinions of his neighbors, of men of good common sense, would be worth more than that of all the experts in the country. * * * * * * It must be apparent to every one, but few wills could stand the test of the fanciful theories of dogmatic witnesses, who bring discredit on science and make the name of 'expert' a by-word and a reproach. We concur with the Judge above referred to; we would not give the testimony of these common sense witnesses, deposing to what they know and saw almost every day for years, for that of so-called *experts*, who always have some favorite theory to support." *Rutherford* v. *Morris*, 77 Ill. 397.

Without pretending to lay down an unvarying rule with respect to the admissibility of expert testimony, because the decision of this case does not require that we should, it may be

said generally that to make the opinions of experts admissible in evidence it is necessary, *First,* " That the subject-matter of inquiry should be within the range of the peculiar skill and experience of the witness; and *secondly,* that it should be one of which the ordinary knowledge and experience of mankind does not enable them to see what inferences should be drawn from the facts." *Rogers on Expert Tes.,* 18 ; *Met. Sav. Bk.* v. *Manion,* 87 Md. 80 ; *Stumore* v. *Shaw,* 68 Md. 19 ; *Muldowney* v. *Ill. Cen. R. R. Co.,* 36 Iowa, 473.

Now, bearing in mind that we are not dealing with a question of insanity or with some occult mental disease, but solely with a statutory mental capacity, or that decree of capacity needed to enable a person to make a valid deed or contract— an every-day transaction and a subject-matter which is within the ordinary knowledge and experience of mankind and where ordinarily intelligent men obviously are able to see what inferences, if any, should be drawn from the facts disclosed to them ; upon what possible principle or theory can an expert be allowed to say that *he* is better qualified to reason logically from those same facts, in such a situation as is here presented, than is the trial Judge ?   And this the expert must say, if not in words certainly in effect, if he undertakes to testify that the facts indicate mental incapacity when the Judge is of opinion that they do not.   It is the settled law of this State that the Judge must determine whether the facts deposed to by a non-expert witness are sufficient to enable the witness to draw a conclusion from them as to a testator's mental capacity.   Before the witness can state his conclusion he must disclose the facts upon which it is founded so that the Judge may see whether those facts are legally sufficient as a basis for any conclusion, whether a rational conclusion to the effect that the testator was not mentally competent, can be drawn from them. If the facts be, in the judgment of the Court, insufficient to warrant the inference that the testator was incompetent, the witness will not be permitted to state such an inference ; and if a rational mind cannot logically deduce from those facts the conclusion sought to be established, then the Court will with-

draw the case from the jury.    Now, it is manifest that if the Court may lawfully say that given facts, needing no interpretation or elucidation and not obscure or scientific, do not warrant a conclusion of mental incapacity ; it is because, in the opinion of the Court, there is no necessary or logical relation between the facts and the conclusion attempted to be deduced from them ; and the question as to whether there *is* such a relation is a question respecting the relevancy of evidence. Wherein does that situation differ from the one where precisely the same facts, not obscure, not technical and needing no interpretation or explanation, are put to a medical expert with a view of getting him to deduce a conclusion though as a matter of law the Court is of opinion that no rational inference of mental incapacity as contemplated by the statute, can be drawn at all ?    As the case was presented there is no question raised involving medical skill, nor is there any inquiry which lies peculiarly within a medical expert's knowledge or experience.    The medical expert is no better qualified to determine from the facts and circumstances alluded to, the testator's capacity to make a valid deed or contract than common-sense people would be, who knew nothing more about him than the expert knew; and the assumption that the expert *is* more competent than other people to deduce inferences from such inconclusive, immaterial and collateral incidents as the record discloses, would, if conceded, put the expert in the place of the Judge to pass upon the relevancy of evidence. Nor would the anomaly end there.    For, if one expert may be permitted to draw an inference of incapacity from such facts in a case presented as this was, then another expert would be allowed to draw precisely the opposite conclusion from identically the same facts.    It is a matter of common knowledge and every-day experiencee that medical experts constantly do that very thing.    Both conclusions cannot be right.  If each of these irreconcilable opinions goes to the jury the issue ceases to be one of fact and degenerates into a conflict of inferences even though the trial Judge should be of opinion that there is no foundation upon which any inference

can rest. And this, too, in a case where the Judge is just as competent, if not better qualified, to determine whether there is any logical relation between the facts and the inference; and he is just as competent to so determine because the whole process is one of reasoning, pure and simple and, therefore, one not within the range of the peculiar skill and experience of a medical expert.

But it is objected : If the Court excludes the medical expert, in the circumstances here presented, then a medical expert would never be allowed to testify in a contested will case, because, *first*, if the facts were, in the opinion of the Court, such as fully to warrant an inference of capacity, the expert would not be permitted to draw an opposite inference; and *secondly*, if the facts were such as to justify the inference of incapacity the expert would not be needed to draw it. Therefore he would be excluded in every instance. But this conclusion is fallacious because not contained within the premises. If the first contingency exists then the expert would be incompetent to testify because the subject-matter would not be within the range of his peculiar skill and experience. It would not be a case for an expert opinion. To this category the case at bar belongs. If the second contingency exists, though the expert might not be needed, if there were facts tending to prove a mental disease, he would be a competent witness to explain that disease and to show its effect or influence upon the intellectual faculties. But there may be a third contingency not included in the dilemma, and it is this : There may be a situation so obscure or so manifestly depending on scientific phenomena that neither Judge nor jury can, without technical aid, draw an accurate conclusion from them. In such an instance the expert would be a competent witness.

It has been insisted that the medical experts should have been allowed to testify for another reason, namely, so as to show that the other witnesses called by the plaintiffs, and who had shown by the facts to which they deposed the existence of an undoubted mental capacity on the part of Mr. Berry, were mistaken. Whilst a party to a cause has no right to

impeach his own witness he may show that his witness was mistaken. The proffered evidence does not fall within that doctrine. It was not proposed to show *facts* at variance with the other facts, but the purpose was to introduce the inferences of medical experts, notwithstanding those inferences were founded on data which furnished no legal basis for such inferences. If the facts did not warrant the introduction of expert testimony because of the reasons heretofore assigned, then the *purpose* for which such testimony was offered could not make it admissible.

No evidence was adduced to show, under the second issue, that the testator did not know the contents of the will; on the contrary all the evidence proved most clearly that he did know and thoroughly understand all of its provisions.

The views we have expressed are sufficient to show, without further elaboration, that the trial Court was entirely right in refusing to let any of the medical experts testify. This being so it becomes unnecessary to notice the several hypothetical questions propounded and excluded, and we, therefore, affirm without further comment the rulings set forth in the *twenty-eighth, twenty-ninth, thirtieth, thirty-first* and *thirty-second* bills of exception.

Of the remaining twenty-one exceptions, seventeen relate to non-expert opinions, five concern the admissibility of certain facts, five affect rulings admitting evidence on cross-examination, and one was taken to a ruling rejecting evidence as to collateral insanity. These exceptions will be briefly treated in the inverse order in which they have just been stated.

In the *eighteenth* bill of exceptions a niece of the testator was asked: " Have there been other members of your family or other connections of your family who are affected with mental trouble ? " Upon objection made by the defendant the question was ruled out. The ruling was right. It is competent to prove that insanity exists or existed in the family of the person whose sanity is under investigation, but this can only be done after a "foundation has been laid by an offer of some direct proof of insanity in the person whose mental con-

dition is in issue." 16 *Am. & Eng. Ency. L.* (2nd ed.) 614, and notes 1, 2, 3. It is only cumulative evidence and unless the foundation above indicated has been laid it is not admissible. Of itself and standing alone it proves nothing. No foundation was laid for its introduction and therefore the evidence of collateral insanity was properly excluded.

The *nineteenth, twentieth, twenty-first, twenty-third* and *twenty-fourth* exceptions were reserved to rulings admitting certain questions as relevant on cross-examination. The *nineteenth, twentieth* and *twenty-first* cover the testimony of Dr. Morgan, the attending physician of Mr. Berry during the latter's last illness and for several years prior thereto. Dr. Morgan was called to the witness stand by the plaintiffs and gave an intelligent and clear description of Mr. Berry's physical condition just preceding his decease. In the course of his testimony Dr. Morgan stated that Mr. Berry had had a fall in January, 1898, and that " the fall shocked his nervous system for a day or two, that was all." The obvious purpose of the plaintiffs was to lay a foundation for an inference that the shock to the nervous system produced some effect upon the mind, and it was clearly competent upon cross-examination to ask the attending physician whether that shock did in any way impair the testator's mind, because such a witness could speak with accuracy of the symptoms and conditions which he saw. The cross-examination was manifestly relevant. The *twenty-third* and *twenty-fourth* exceptions relate to part of the testimony of John W. Marshall. A paper was introduced during the direct examination of that witness, and the paper showed some inaccuracies in a calculation made by Mr. Berry. Upon cross-examination Mr. Marshall was asked to produce another paper, in the handwriting of the testator, upon which the calculation was correct. If the object of the offer of the first paper was to show an incapacity to calculate, it was competent on cross-examination to rebut that by showing that he could, and the most direct way of doing so was by the production of other calculations. But even if the ruling were wrong no injury was done. The case was taken from the jury because of the want of legally suffi-

cient evidence to sustain the *first* and *second* issues, and the fact that on one piece of paper Mr. Berry had made a mistake in multiplying certain figures whilst on another slip of paper he had correctly multiplied other figures in no way reflects. on the question as to whether the Court was right in holding that there was a failure of evidence to prove mental incapacity. A mistake in multiplying a set of figures no more proves an inability to make a valid deed or contract than would a mistake in spelling or in grammar.    In an inventory of his property made out by Mr. Berry and heretofore alluded to there appeared two entries, one of two hundred and fifty shares of City Passenger Railway stock and one of two hundred and fifty-two shares of Consolidated Railway stock.    Mr. Marshall stated on his examination in chief that the inventory, including the two entries just spoken of, was a correct list of Mr. Berry's property.    In fact, however, Mr. Berry had sold the above mentioned shares of stock after the will had been executed. Upon cross-examination the witness said that Mr. Berry had told him on February the tenth, 1899—the day the will was signed—that he had agreed to sell the stock and that he intended to deposit the proceeds of sale at the Mercantile Trust and Deposit Company.    Mr. Berry did do this and the witness added " and I have the bank-book showing that deposit." There was no error in the ruling admitting this testimony. The statement made by Mr. Berry enabled Mr. Marshall to identify the money deposited as a substitute for the stock which had been sold.    But even had the ruling been wrong no injury was done by it and consequently it would not justify a reversal.

The *fifth, eighth, twenty-second, twenty-six and a-half* and *twenty-seven and a-half* exceptions relate to the exclusion of evidence.    The *eighth, twenty-six and a-half* and *twenty-seven and a-half* need not be discussed as they are fully covered by what was said on the former appeal.    The *fifth* arose in this way : Frederick A. Cochran testified that he was present when the will was read and the plaintiffs then offered to prove that Mr. Marshall (who drew the will and who is and then was, as has been previously stated, the vice-president of the defend-

ant corporation—the executor—) said in a conversation before the executor qualified, that the children of Mr. Berry's brother Charles had been left out of the will because he, Marshall, thought they were grand-nieces and not nieces and nephews of George R. Berry. This was not admissible; and it would not have been competent evidence even if Mr. Marshall had been the executor. No declaration made by an executor before his qualification can be received against him as the representative of the estate or bind legatees, distributees or creditors. I *Green. Ev.*, sec. 179; *Webster* v. *LeCompt, 74* Md. 259. In the *twenty-second* exception the plaintiffs offered to ask Mr. Marshall whether he had not "after the death of Mr. Berry and after the qualification of the executor threatened the plaintiffs, or some one in their behalf or some one connected with the prosecution of the caveat, that in the event of the will being sustained he would take away from them the bequest made by the testator." This was wholly irrelevant. Suppose Mr. Marshall had so stated, it would have been a very foolish remark signifying literally nothing, because he was powerless to do anything of the sort. If he did make the statement what issue did it tend to prove? Obviously none. And it was clearly not competent as a foundation for the impeachment of the credibility of the plaintiffs' own witness.

The *first, second, third, fourth, sixth, seventh, tenth, eleventh, twelfth, thirteenth, fifteenth, sixteenth, seventeenth, twenty-fifth, twenty-sixth* and *twenty-seventh* exceptions were taken to the exclusion of non-expert opinions. There is no exception numbered *nine* in the record. We do not deem it necessary to consider these exceptions at length. What has been said in this opinion and what was decided on the former appeal respecting most of these questions is all that is needed to show there was no error committed in any of those seventeen rulings. It is apparent that none of the witnesses disclosed adequate bases for acquiring a knowledge of Mr. Berry's mental capacity; with possibly the single exception of Dr. Harris, and he did not undertake to speak of Mr. Berry's capacity as

of the day the will was executed.   If such frivolous data as most of the witnesses relied on for the formation of a judgment as to Mr. Berry's capacity were treated as sufficient for that purpose the trial of a caveat to a will would become a mere travesty of justice ; and no man would feel assured that his dispositions of his property by last will would be respected or upheld.   The rules of evidence cannot be applied too rigidly in such cases as this, and the *legal* standard of testamentary capacity must be kept clearly and sharply distinct from the speculative vagaries of dogmatic experts.   The common sense of Judges and of jurors too if a case is submitted to them, must interpose to arrest such groundless assaults on wills.   We have gone patiently through the merits of this case twice and we entertain not the faintest doubt as to Mr. Berry's thorough competency to make a valid will.   As we find no errors in any of the rulings made below they are all affirmed.   The record will be remanded so that the Court of Common Pleas may certify back to the Orphans' Court of Baltimore City the findings of the jury and the costs in the case with a view of bringing this protracted and expensive contest to a close.

*Rulings affirmed and record remanded.*

(Decided December 3rd, 1902.)