# WILLIAMS ET UX. *v.* MORAN, COMMITTEE FOR GERTRUDE A. MEEHAN

[No. 692, September Term, 1966.]

280

The cause was argued before HAMMOND, C. J., and MAR-BURY, McWILLIAMS, FINAN and SINGLEY, JJ.

*Henry F. Lankford* for appellants.

*John B. Robins,* with whom were *Robins & Robins* and *Stanley G. Robins* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Wicomico County, sitting in equity, which vacated and set aside a deed from Gertrude A. Meehan, widow, to James T. Williams and Madeline S. Williams, his wife, the appellants here and the defendants below, on condition that there be paid to the appellants the sum of $950.00. We find no reason to disturb the determination reached by the Chancellor below.

In about 1929, Gertrude A. Meehan and Charles H. Meehan, her husband, purchased a residence situated on a tract of approximately 25 acres, in the Parsons Election District of Wicomico County, a part of which was set in growing timber. Here the Meehans made their home until the death of Mr. Meehan in the summer of 1961. Thereafter, Mrs. Meehan lived on the premises alone. Mr. Meehan had been ill for some time prior to his death, and recognizing the seriousness of his illness and that his wife was inexperienced in business affairs, had sought the aid of a neighbor, John C. Moran, and "told Mrs. Meehan to take [Mr. Moran's] advice in everything." After Mr. Meehan's death, Mr. Moran assisted Mrs. Meehan in the transfer of certain jointly owned securities, in the reinvestment

of certain of her funds, saw to it that she was taken to the grocery store at regular intervals, and generally oversaw the maintenance of the residence property.

On June 25, 1964 Mr. and Mrs. Moran left for a trip to California and were gone a month.

James T. Williams, the appellant, was a teacher at the Delmar, Delaware High School. He was a son of Louise Williams, who had been a neighbor of Mrs. Meehan's for about 40 years. The testimony shows that some time in May, 1964, James T. Williams visited Mrs. Meehan and inquired about the possibility of purchasing her farm under an arrangement which would reserve a life interest to Mrs. Meehan. Mrs. Meehan declined to consider this suggestion. On June 26, the day after the Morans had left for California, Mr. Williams again visited Mrs. Meehan and repeated his offer. According to Williams' testimony, Mrs. Meehan said that she was willing to sell. Later on the 26th, Williams called Howard R. Elliott, the manager of the branch of the Farmers Bank in Laurel, Delaware, to ask whether he could make an appraisal of the Meehan property. Elliott replied that he could not do so before the "first of the week" and on Monday, June 29, Mr. Williams, Mr. Elliott and Mr. George Schollenberger, a teacher at the Laurel School, went to the Meehan property. Mr. Elliot "walked over the property" then "got in the car and rode around on Williams Pond Road" and returned with Williams and Schollenberger to the Meehan residence. Mr. Elliott explained to Mrs. Meehan that in his judgment, the property had a value of $5,000.00. At that time the following paper was signed by Mrs. Meehan:

> "I, Mrs. Gertrude Meehan (Mrs. Charles Meehand) Route #3, Delmar, Md., agree to sell my farm containing twenty-five acres more or less, to James T. Williams, Route #3, Delmar, Md., for the sum of $5,000.00. This certifies that I have received $50 as down payment on the property this date with the balance of $4,950.00 to be paid in full at the time of the transfer of deed and closing of the sale of the property.

"It is agreed that I, Mrs. Charles Meehan (Mrs. Gertrude Meehan) be allowed to live in the dwelling that I now occupy for the rest of my natural life or as long as I should desire."

It is not clear whether Mrs. Meehan was given a copy of this paper or what disposition was made of her copy, if she received one.

Some time during the week of June 29, Mrs. Meehan went with the appellant, Mrs. Madeline S. Williams, to her safe deposit box at Delmar where she removed her deed to the property, and thereafter, an attorney, Patrick L. Rogan, Jr., at Mr. Williams' request, prepared a deed conveying an absolute fee simple title to Mr. and Mrs. Williams. At that time, Mr. Rogan was apparently not advised of the understanding with respect to the reservation of the life interest and no such provision was included in the deed which he prepared. The deed was signed by Mrs. Meehan on July 2, 1964 and immediately thereafter was recorded among the Land Records of Wicomico County. On July 5 or 7, a deposit of $4,981.00 was credited to Mrs. Meehan's bank account, apparently made by Mr. or Mrs. Williams.

On July 25, 1964, Mr. and Mrs. Moran returned from California, and on July 26, Mr. Moran drove over to Mrs. Meehan's house to see if she needed anything from town. When he arrived, he found a young man hammering on the barn, who, according to Moran, identified himself as Jimmie Williams, and said, "I live down the road. I bought the place from Mrs. Meehan." Moran expressed concern about Mrs. Meehan's ability to adjust herself. According to Moran, Williams replied:

"Oh, don't worry about that; I have given Mrs. Meehan a life right in the place. As a matter of fact, Mrs. Meehan signed an agreement with me at my mother's house before two witnesses that she can stay there as long as she likes, and I will take care of her as long as she lives."

When Mr. Moran saw Mrs. Meehan, Mrs. Meehan seemed to have been under the impression that the Morans had been to

New York for a weekend. When he asked about Jimmie Williams' working on the barn, she replied, "Yes, he asked me could he store some things there and I told him he could." She also told Mr. Moran that Williams was fixing the place up to make it safe. When Mr. Moran suggested that Williams had bought the place, Mrs. Meehan said, "Oh, of course, he didn't. He was just joking. He never bought this place. It's not for sale. And he knows that." It was at this time that the deposit in the bank account was discovered by Mr. Moran.

On August 4, Mr. Moran had Mrs. Meehan examined by Dr. David Warren Shave, a psychiatrist, who testified that in his opinion, Mrs. Meehan was suffering from arteriosclerosis, was incompetent and had probably been incompetent for two years. On the same day, Mrs. Meehan was taken to the office of Dr. Philip A. Insley by the appellant, Mrs. Madeline S. Williams. Dr. Insley admitted that his examination was not directed at the determination of mental competence but he was of the opinion that she was oriented, in control of her faculties, and probably capable of living alone.

Some time in August of 1964, Mr. Williams sold the timber on the Meehan place for $4,050.00, thus reducing his net investment to $950.00. On December 1, 1964, Mrs. Meehan was examined, at Mr. Moran's instance, by Dr. Earl M. Beardsley, who concluded that she was incompetent at the time of the examination and because of the progressive nature of her arteriosclerosis, had probably been incompetent for between two and three years. On December 8, Mrs. Meehan was again examined, at Mr. Moran's instance, by Dr. Shave, who found that there had been little change in her condition and that her intellectual impairment was "about the same." On December 14, Mrs. Meehan was formally adjudicated an incompetent by the Circuit Court for Wicomico County and Mr. Moran qualified as her Committee. On April 6, 1965 there was instituted by Mr. Moran the Bill of Complaint which gave rise to the decree below, from which this appeal was taken.

The record shows that on July 2, 1964, the day that Mrs. Meehan executed the deed to Mr. and Mrs. Williams, she was within two days of being 82 years of age; that she had lived a restricted life; and that after the death of her husband, placed

great reliance on Mr. Moran and other friends and neighbors for assistance in meeting the needs of day-to-day living. No effort was made by the appellants to contradict the testimony of Carolyn J. LeCates, who was a senior at the Delmar High School in the year 1964-1965 and when serving dinner for the teachers of the high school just prior to Christmas, 1964, overheard the appellant, Williams, tell another teacher at the school that "he [Williams] had to do something while Mr. Moran was in California."

Of equal importance is the discrepancy in values as fixed by the testimony of expert witnesses. Howard R. Elliott, the appraiser employed by the appellants, valued the property at $5,000.00, of which he attributed $2,670.00 to the value of the timber, which was later sold for $4,050.00. S. Denmead Kolb and Gerald B. Truitt, appraisers produced by the appellee, valued the property at $25,000.00 and $20,000.00 respectively. All three testified as to recent sales of comparable property, but the record does not indicate whether Mr. Elliott assembled his information on comparable sales before or after he arrived at the figure of $5,000.00 on June 29, three days after he had been employed by Mr. Williams. Mrs. Louise Williams, the mother of the appellant James T. Williams, testified that she had sold lots of less than an acre some 600 to 700 feet from the Meehan property for prices as high as $3,000.00.

I

The principal contention made by the appellants is that "The lay witnesses were more qualified to testify as to the mental capacity of Gertrude A. Meehan than Earl A. Beardsley from one examination and Dr. David Shave from two examinations" and cite *Berry v. Safe Deposit and Trust Company of Baltimore,* 96 Md. 45, 53 A. 720 (1902) (the Berry will case) and *Henkel v. Alexander,* 198 Md. 311, 83 A. 2d 866 (1951) in support of this contention. They also contend that the lower court was in error in its construction of *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547 (1944).

The rule of *Berry* and *Henkel* is not so broad as that contended for by the appellants. In *Berry,* medical experts who were not acquainted with the decedent were not permitted "to

draw inferences from circumstances testified to by the other witnesses, when obviously those circumstances were insufficient, in the judgment of the court, to warrant a conclusion that the testator was devoid of a testamentary capacity at the time the will was made." 96 Md. at 57. Chief Judge Marbury pointed up the issue in *Henkel* when he said, 198 Md. at 317:

> "Where the question of the mental capacity of anyone on a certain date is the issue, evidence of physicians, who saw the patient at a later date is admissible, if they state that the mental disease from which he is suffering at the later date, was, in their opinion, affecting him at the earlier date, so that he could not then execute a valid deed. But it has been also stated in the decisions so holding that such evidence is not legally sufficient to establish the fact of mental incapacity at the earlier date. (Citing cases.) Here we have the testimony of three physicians who never saw Zimmers until six months after the deeds were executed. The only physician who saw him about that time said he appeared normal, and so did the lawyer and the bank president notary who were present at the time. Under these circumstances, we cannot agree with the chancellor that there was sufficient evidence to find that Zimmers lacked mental capacity to execute his deed which is here questioned."

Admittedly, the appellee bore the burden of proving Mrs. Meehan's incapacity. As this Court held in *Williams v. Robinson,* 183 Md. at 121, 36 A. 2d at 549:

> "The law presumes every man to be capable of making a valid deed or contract. If a complainant in a suit to annul a deed relies upon lack of mental capacity, he must prove it by a preponderance of the evidence."

The burden of showing undue influence, fraud, or a degree of improvidence amounting to constructive fraud is substantially similar, but shifts where a confidential relationship exists. *Hoffman v. Rickell,* 191 Md. 591, 62 A. 2d 597 (1948); *Mead*

*v. Gilbert,* 170 Md. 592, 185 A. 668 (1936) ; *Upman v. Thomey,* 145 Md. 347, 125 A. 860 (1924).

The *Berry* and *Henkel* cases merely enunciate the Maryland rule,[1] described by Judge Barnes in his opinion for the Court in *Ingalls v. Trustees of the Mt. Oak Methodist Church Cemetery,* 244 Md. 243, 257-58, 223 A. 2d 778 (1966) :

> "It is the established practice in Maryland to permit a lay witness to give an opinion in regard to the mental capacity of a testator, even though that opinion amounts to a conclusion on the very legal issue upon which the trial court must instruct the jury. (Citing cases.) Notwithstanding that the majority of jurisdictions other than Maryland would refuse to permit a witness to answer such a question, and Professor McCormick, indicates that he thinks the majority rule is to be preferred, the Maryland practice is too well established by our prior decisions to be departed from now and we adhere to our prior decisions in this regard.
>
> "The Maryland rule in regard to the admissibilty of opinion testimony by lay witnesses in cases involving challenges to wills because of alleged mental incapacity is subject, however, to a most important and well-established qualification, i.e., that the lay witness must precede his opinion by disclosing his means of knowledge as to the mental condition of the testator and his reasons for the conclusion stated. The Maryland rule was stated by Judge Delaplaine, for the Court, in *Doyle v. Rody,* 180 Md. 471, 481, 25 A. 2d 457, 462 (1942), as follows :
>
> > 'But a non-expert witness is qualified to express an opinion as to a testator's mental capacity only

---

1. The legal standard for the determination of testamentary capacity adopted by Maryland is Code (1957) Art. 93 § 349: "Unless the person making the same be * * * capable of executing a valid deed or contract." This standard makes decisions in caveat cases and cases for the rescission of contracts on grounds of incompetency equally applicable.

where the acts and circumstances, of which the witness had personal knowledge, are sufficient to form a basis for the formation of rational opinion. He must state the facts as far as he can and disclose what led to his conclusion. If the whole testimony of the witness fails to show facts sufficient to justify the conclusion reached by him, he should not be permitted to express an opinion.' "

This was reiterated in the comprehensive opinion filed for the Court by Judge Barnes in *Sachs v. Little,* 245 Md. 343, 226 A. 2d 283 (1967).

## II

The second and principal contention made by the appellants is that the lower court was in error in vacating and setting aside the deed executed on July 2, 1964 by Mrs. Meehan. The tests applied in cases based on undue influence and lack of mental capacity are clearly set forth in Judge Horney's opinion for the Court in *Arbogast v. MacMillan,* 221 Md. 516, 158 A. 2d 97 (1960). Dr. Shave, who had examined Mrs. Meehan on August 4, 1964, testified:

"I asked her what her name was; and she told me. I asked her what the date was; and she was unable to give me the day, the month, and also the year. She was unable to tell me what year it was. I asked her who the president was. She wasn't able to tell me; wasn't able to tell me who the present president was. I asked her what president was recently assassinated; and she wasn't able to tell me. But she had told me that she had read the newspaper and listened to the radio. She couldn't tell me what the capitol [sic] of France was; or what the capitol [sic] of England was; who the queen of England was; the Governor of Maryland. She was unable to do serial subtraction of 7 from 100. I asked her how many quarters in $3.50. She wasn't able to tell me."

and came to the conclusion that Mrs. Meehan had been incompetent for at least two years. Dr. Insley, on the other hand,

who examined Mrs. Meehan on the same day, at the instance of Mrs. Williams, one of the appellants, testified:

> Mrs. Meehan stated that she had fallen about a week prior to this visit and that she had injured her left wrist. I examined her wrist and talked to her for a short time. During the time she appeared alert to me and answered my questions in such a manner to indicate that — I thought that she was oriented and in control of her faculties. And I told Mrs. Williams that I thought she was alert, and that it was my opinion that she was well able to take care of herself physically—and I thought probably capable of living alone. And I told her I thought she had a slight sprain of her wrist. During this examination I did not get the impression that I was judging her competency for any legal purposes—but mainly just to determine whether or not she was capable of living alone and taking care of herself."

Without passing on the admissibility of the medical testimony or the weight to be given it, if admissible, there was testimony of lay witnesses which was considered by the court. Mrs. Adelaide Jester, a secretary in the brokerage firm of Laird, Bissell and Meeds, in Salisbury, testified that at the time of Mr. Meehan's death in 1961, she thought that Mrs. Meehan "was quite senile at the time and wasn't aware of anything she was signing" and that as Mrs. Meehan got older, she "noticed quite a deterioration." Mrs. Hilda Callaway, a neighbor who saw Mrs. Meehan "three or four times a week" testified that Mrs. Meehan was a very sheltered woman who "never went to the store;" "lived to herself;" and "didn't know anything about business." On the day after Mrs. Meehan signed the deed of July 2, Mrs. Meehan had told Mrs. Callaway that she had not sold the property to Mr. Williams but had told Mr. Williams that "he could cut the trees" and later that she had signed a paper which she didn't read, but which "was just to let him cut the trees."

In addition to his testimony with respect to the Williams transaction, Mr. Moran testified that Mrs. Meehan used to get

letters asking for donations or subscriptions to magazines "and every time she would get one of those letters, she would think she owed the money to the people who sent the letter." There were introduced in evidence five checks sent by Mrs. Meehan to "Life" magazine during the period January, 1964 to July, 1964, totalling $18.70, apparently under the impression that her subscription had expired. Such testimony was properly considered by the lower court, together with the inferences which could be drawn from the rapidity with which the transaction was initiated (June 26, 1964) and concluded (July 2, 1964); the wide variance which existed between the opinion as to the value of the property reached by Mr. Howard R. Elliott and the opinion of S. Denmead Kolb and Gerald B. Truitt; the uncontested testimony of Miss Carolyn J. Le-Cates; and the sale of the timber by the appellants.

The Chancellor admitted the testimony of lay witnesses called by the appellees and by the appellants. As the trier of the facts, he had the opportunity of seeing the witnesses, determining their credibility, and giving appropriate weight to their testimony. After so doing, he found:

> "(1) The grantor in the deed involved here did not understand the nature and extent of her transaction;
> (2) That she was mentally incompetent to make a valid deed or will at the time; and
> (3) The price paid in the transaction and for the property involved did not exceed more than perhaps one-third of the value of the property conveyed."

These findings we are unwilling to disturb. Maryland Rule 886 a; *Hamilton v. Smith,* 242 Md. 599, 604-05, 219 A. 2d 783 (1966); *Wood v. Wood,* 227 Md. 211, 218, 176 A. 2d 229 (1961).

Admittedly, the case at bar does not involve a parent and child, or persons occupying positions which would make the concept of a confidential relationship necessarily applicable. *Restatement of Contracts* § 497 (1952). We understand that absent such relationship, the burden of proof remains with the

person who attacks the validity of a deed. Taking the record as a whole, we cannot say that the appellee failed to meet this burden.

## III

The appellants also contended that the lower court was in error when it overruled their exceptions to the sufficiency of the appellee's answers to the appellants' interrogatories, citing Maryland Rule 417.

The appellants' interrogatories and the answers to which exceptions were taken were as follows:

> "5. State in detail the facts the plaintiff expects to produce to prove that cerebral arteriosclerosis was the cause of the said Gertrude A. Meehan's alleged incapability of executing a valid deed or contract on or about the 2nd day of July, 1964, as alleged in the plaintiff's bill of complaint."

> [Ans] "Relies upon examinations and reports of Dr. Earl M. Beardsley and Dr. David W. Shave and their testimony to be offered as experts. Complainant has no intimate knowledge of their findings but only their conclusions as per court proceedings."

> "7. State what specific acts and the dates thereof, of undue influence were practiced upon the said Gertrude A. Meehan to obtain the deed, dated July 2, 1964."

> [Ans] "John C. Moran had been taking care of the financial affairs of Gertrude A. Meehan for about three years prior to the execution of the deed in question, pursuant to the request of Charles H. Meehan, deceased husband of Gertrude A. Meehan, made prior to his death in 1961. The Defendants, knowing of the absence of John C. Moran and his wife from the State of Maryland and while they were in California, then seized the opportunity of obtaining Ger-

trude A. Meehan's signature to the deed in question, all while Gertrude A. Meehan was senile and incompetent and at a grossly inadequate price. The acts occurred between June 29, 1964 and July 2, 1964, to the best of the knowledge and belief of complainant."

It is our view that the appellants' exceptions were properly overruled by the court below. As Judge (later Chief Judge) Prescott speaking for the Court said in *Baltimore Transit Co. v. Mezzanotti,* 227 Md. 8, 13-14, 174 A. 2d 768 (1961) :

"We do not deem it necessary nor desirable, at this time, to make an extended or elaborate statement concerning our discovery rules. It will suffice to say that it is clear they are broad and comprehensive in scope, and were deliberately designed so to be. One of their fundamental and principal objectives is to require the disclosure of *facts* by a party litigant to all of his adversaries, and thereby to eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, concerning the facts that gave rise to the litigation. If all of the parties have knowledge of all of the relevant, pertinent and non-privileged facts, or the knowledge of the existence or whereabouts of such facts, the parties should be able properly to prepare their claims and defenses, thereby advancing the sound and expeditious administration of justice. In order to accomplish the above purposes, the discovery rules are to be liberally construed. And the trial judges, who are primarily called upon to administer said rules, are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of a showing of its abuse."

We hold that there was no abuse of discretion here. The objectives set out in *Mezzanotti* were met; and as is pointed

out by the appellee, the appellants were free to take pre-trial depositions of the witnesses whose names were disclosed.

*Decree affirmed; costs to be paid by the appellants.*