# CIRCUIT COURT OF BALTIMORE CITY.

Filed April 30, 1928.

CLAIRE J. ULRICH WHITEHURST
VS.
ANNA L. WHITEHURST TAYLOR.

*Randolph Barton, Jr., William L. Marbury, William R. Semans, William L. Marbury, Jr., Edgar A. Martin* (of New York) solicitors for complainant.

*Vernon Cook, George Ross Veazey* solicitors for defendant.

O'DUNNE, J.—

Mr. Marbury, Sr., in argument, characterized this case as (save only one) "the most fascinating, interesting and unique," in his long experience at the Bar. Limited by my less expansive horizon, I fully concur in his diagnosis, and make additional comment, that it far exceeds anything that has come under my brief judicial observation in the thoroughness of its preparation on both sides, in skill of execution, and masterly presentation, oral argument alone lasting more than three whole days. It may be justly styled "a cause celebre." It has human and professional interest, from other angles:

(a) It exemplifies strict adherence to some of the finer traditions of the Bar. Mr. Marbury, Sr., found that under certain inevitable aspects of the case, it would become necessary for him to testify, even to a now comparatively minor matter. He, therefore, withdrew from active personal participation in the trial work, and turned it over to the firm of Barton, Wilmer, Ambler & Barton. He was only persuaded to take part in the argument, on the special invitation of the Court.

(b) When the New York settlement or compromise had been effected, with-

out his knowledge or consent, and in a way in which he believed his client had been grossly defrauded by Mr. Ascher, then her own counsel in New York, and when later, nearly a year after the settlement, Ascher sent him a check for his proportion of the fee, some $2,000, he declined to participate in the fee and returned the money, and here denounced him in oral argument.

(c) The cause is interesting and refreshing from another angle. It presents an "oasis" in the desert of "expert testimony." Mr. Bert C. Farrar, handwriting expert connected with the Treasury Department in Washington, D. C., having been retained by the complainant's counsel for his opinion on the genuineness of Charles E. Whitehurst's signature in the prayerbook, and after having given frank opinionate evidence in complainant's favor as to the signature "Charles" in the prayer-book being *genuine*, he admitted inability to satisfactorily determine the other signature "Claire," unless he knew the conditions under which it was written, as those satisfactorily accounting for the hesitation and "patchwork" there present, but of which he said he had evidence of similar patchwork in other writings of Charles. More important on the refreshing element of candor in expert testimony, was his willingness freely to admit, not only in Court, but previously to counsel retaining him, that the word "Wifey" in the disputed letter was, in his opinion, not written in "sequence," that it "overhangs" other parts of the text, which it would not overhang *if* written in sequence, and that the "W" in "Wifey" has more of the characteristics of the writing of "Claire" than that of "Charles." Such candor in opinionate expert testimony, if generally adopted by experts in all lines, would soon relieve that branch of evidence from the stigma which has justly been attached to it, and to which Chief Justice McSherry so ably paid his respects in the two Berry Will Cases in 93 Md. at 568-9 and 96 Md. 57.

(d) This case is interesting for the additional and unique situation presented in the necessity of establishing by expert testimony the law of New York as to the requirements for common law marriage. On which branch was called Judge Frank S. Hiscock, former Chief Judge of the Court of Appeals of New York State, as expert on the side of the defense, and Mr.

Benjamin A. Matthews, of Harper and Matthews, 74 Trinity place, N. Y., practitioner there, as *"expert"* called for the complainant. And, as is usual with experts, *they do not agree on the law of New York.* There is nothing unique or novel in a lawyer not agreeing with a judge as to what the law of his State is; but Judge Hiscock is no longer judge, having been retired as Chief Judge of New York Court of Appeals recently, on reaching the 70-year age limit, and has again become a *lawyer* and *practitioner.*

(e) Additionally interesting is this cause, because of one of the contributions to the work of W. L. Marbury, Jr., and William R. Semans in the form of a most able brief of over 50 pages, analyzing, criticising and distinguishing all the New York cases cited by the experts on both sides. So complete is it as a piece of legal work that it is well worthy of publication as a "monograph" in some law journal. As against this, Mr. Vernon Cook has filed a brief of some 200 printed pages in the form of a late text book, evidently acquired for the purposes of this case, and recently published by Otto E. Koegel, D. C. L., counsel U. S. Veterans' Bureau and Professor in National Northwestern Law School. Both briefs are on the narrow point of common law marriage (all of *both* of which briefs I have carefully read in connection with my part of the work of this case, in violation, probably, both of "union hours" and "Sunday work" laws), but with intense interest and complete bewilderment, from which I emerge with the belief that there is not a case in all the New York decisions on New York common law marriage directly decisive of whether *agreement only* constitutes the contract of marriage, or whether it also requires cohabitation and repute.

(f) Of additional interest also is this case, because it presents a *new* question under the laws of evidence, never, I think, flatly decided in Maryland, whether, under the disability evidential act, one party to a contract can be heard to testify where the other party is dead and the suit is against distributees as such. If the Maryland statute is applicable here, the complainant would be ineligible to testify to her own alleged marriage with the deceased, Charles E. Whitehurst, because of his death.

(g) Of additional interest, because a $16,000 settlement had in fact been made by the Whitehursts with one of her New York counsel, Mr. Ascher, under circumstances where he made it appear both to her and to the New York Courts that the settlement was for $11,000 by certified check to her order, whereas he in fact both demanded and received $5,000 in cash at the same time, with no recital in the release of assignment to Mrs. Taylor (mother of the Whitehursts), of the amount received, other than $5.00, and then Mr. Ascher withheld from his co-counsel, Mr. W. L. Marbury, Sr., both the *fact* of and *amount* of settlement, and it was in this connection that Mr. Marbury refused to accept his portion of the fee when sent him by Mr. Ascher, nearly a year later, on the ground that the settlement was a fraud on their client, the complainant, and in connection with the whole circumstances of the case, the solicitors for complainant are asking that the deed of assignment by complainant be set aside as not binding on her.

(h) The last additional unique feature is perhaps the fact that the Court finds for the complainant on practically all the issues of the case, except the *one issue of marriage*, which is the *only issue* having for complainant other than purely *academic* interest.

It is needless to further multiply illustrations of the specially fascinating legal features of this case, of which a record of some 3,000 pages fairly teems with additional examples.

I will, therefore, briefly state such conclusions as I have been able to come to on the major and controlling questions. I am deeply indebted to counsel on both sides for the assistance they have given me in the masterly fashion in which the evidence has been marshalled, the law collected and brilliantly presented in *exhaustive*, but by no means *exhausting*, arguments.

I can but touch the high spots of this "story" "of the way of a man and a maid." Complainant was then a girl of 22; he 54. She had been three years in a Catholic convent or school in her early life, was later baptized a Baptist, and some four years thereafter, baptized a Catholic. Her mother and father separated and divorced, she clinging to her father's side; has a brief stage career of a few weeks. Re-

hearses a week at the Century roof, plays a week in the chorus, gets brief engagements elsewhere, travels a little in "one night stands." Either she, or others, decide she has not much theatrical talent (at that time at least) wherefore she goes to more steady work with the Ginsberg's millinery and dressmaking establishment at $20 a week. Gets acquainted while in theatrical work with Charles E. Whitehurst (place and time disputed). She lives at Martha Washington Hotel (exclusively for women). She claims, on March 21, 1923, she became engaged to Charles E. Whitehurst while he is calling on her at the Martha Washington; that they later agree on the date of April 9th, 1923, as the day on which they will get married, but not *publicly*, because, according to her contention, he claims to have promised his aged mother he would not marry in her lifetime (though others of his brothers and sisters are married, and his mother herself twice married). Whitehurst, who lives in Baltimore on Eutaw Place, has theatrical interests here, both in Century, Garden, Parkway Theatres, etc. He keeps an apartment in New York City at 8th avenue and 57th street which he regularly visits, arriving in New York generally on the 8.10 P. M. train Mondays and returning on the Wednesday afternoon train to Baltimore. Unable (as she claims) to marry her publicly, for reasons given (common law marriage being valid in New York, though neither is shown to *know* this fact), they had previously arranged to marry themselves, by *mutual acceptance* and the *reading of the marriage ceremony out of her Catholic prayer book*, which contains a marriage ritual, and she claims to have previously given Charles this prayer book to study this ritual.

Expecting to meet Charles on arrival of the 8.10 P. M. train from Baltimore, Monday, April 9th, 1923, and go with him to his apartment for the ceremony (and which apartment she claims never to have previously been in) she is unexpectedly called to her nearest and dearest friend, Anna Stevenson, from Lansdale, Pa. Anna wants to visit her to consult her on something of importance to said Anna Stevenson, and she tells her to come, and Anna comes on Sunday, *previous* to the Monday, April 9th, 1923, in question and is registered with her at the Martha Washington (established by the register). Com-

plainant claims that she and Anna meet Charles on arrival of the 8.10 train Monday, April 9th, 1923, and they go in a taxi to Charles' apartment, where she produces the prayer book with the marriage ceremony or ritual in it. Complainant claims Charles is "mad" or displeased about the presence of Anna in New York when they wanted to be alone (how he ever got this information except at the station from Anna's presence there, is not shown or explained). Why the ceremony which was desired to be secret was not postponed, is not shown; anyhow, she says Charles proceeded to read the groom's part of the ritual, and she, the bride's, that he placed a wedding ring upon her finger, and then signed his name in the prayer book and then her's, so that it reads in effect: "1 'Charles,' take thee, 'Claire,' for my lawful wife," and she signs on next page: "I, 'Claire,' take thee 'Charles' for my lawful husband," then he kisses her, they go to Knickerbocker Grill for dinner, and at about 11 P. M. they drive back to the Martha Washington and park Anna Stevenson there for the night and return to the apartment, and the inference is they thereafter first consummate the marriage by cohabitation, and, as the story goes, live happily forever afterwards; she, under the name of Claire J. Ulrich, at the apartment of Charles E. Whitehurst, 57th street and 8th avenue. She claims some introductions by him to New York friends as Mrs. Whitehurst, one to a milliner, Mrs. Wells, where he took her and established a 90-day credit (and the estate later paid a $600 bill) and some other instances of introductions as Mrs. Whitehurst not of importance to now enumerate in detail. Other evidence is to effect that she was known to and introduced by Whitehurst as "Claire Ulrich," to various of his friends, or simply as "Claire," and this after April 9th, 1923. Numerous letters from Charles E. Whitehurst from Baltimore are produced. They are addressed to Miss Claire J. Ulrich at his apartment address, 8th avenue and 57th street, New York. Argument is made that the letters bear internal evidence of the unlikelihood of a man writing such letters to the woman he regarded as wife. Without knowing the man himself, this problem is one difficult of determination requiring more and new kinds of "expert testimony." I select one letter as a fair sample; others are more gross, more coarse. This one is a "key" letter, because of the word "wifey" in it:

Century Theatre.
Baltimore.

Executive Dept.,
Memo.

Friday.

Dear Kido—
Wifey & Decarator &
Cook & Movie Star,
almost not yet.

Well, anyhow homsomever it may be you are right there with the mustard when it comes to certain performances and you will be awarded the gold medal in Class A or there will be trouble.

Now will you be good. O, yes you are always a good little bad girl, no you are my big girl but will soon be my little girl.

Just heard from Ditmar and I hope to see him next week, but I do not think he has any photo of you.

Hurriedly with love and kisses,

Charles.

"Wifey" in the above letter is the word the expert for complainant refers to "as not written in sequence" and as "overhanging" the text and the "W" of which has more of the characteristics of "Claire" than of "Charles." Deft. witness, Mrs. Wolf, housewoman in apartment of Ginsbergs, where Claire was also then living with the family, says: "Claire" forged the word "wifey" in the letter after going down to Baltimore and getting the letters back from Mr. Leach. Mr. Leach does not remember any such "wifey" letter when he had the papers, but admits he is hazy now as to his recollection, and had not carefully gone over the evidence submitted to him, not being ready at that time to take the case up actively, but thinks if he had seen word "wifey" in letter it would have left an impression on his mind. She did not bring the prayer book to him; thinks she told him something of it from what man in his office has since told him.

Mrs. Ginsberg, brought on at the Court's request from New York after end of argument, says she advised Claire to get her letters back from Mr. Leach and place them in the hands of Sam Berger, whom she recommended

as a lawyer. "Claire" brought the letters back and the two of them went over the letters together. Mrs. Ginsberg found one that advised Claire to get a man nearer her own age (Whitehurst being then 54 and she then 22) ; another figures that suggested she get work during the time he was in New York. Mrs. Ginsberg told her to tear those two up and not give them to Sam Berger, her newly selected lawyer, as not helpful to her case, and that she tore them up, saw her do it. Told her to select only about ten letters to show to her lawyer. Says Claire took a plate glass from top of a little dressing table and put it on top of letters and had some tracing paper, and when she, Mrs. Ginsberg, was absent about half hour in her room undressing, and came back where Claire was at the table with the letters she, Claire, had the word "wifey" in the letter *when it had not been there before!* Claire asked her how it looked and she said just like Whitehurst had written it. Mrs. Wolf, who claims to have seen Claire do the work, says Mrs. Ginsberg was a party to it, helping her by looking over letters for particular letters in words until the word "wifey" was made up. Mrs. Ginsberg takes the precaution to put herself in another room while the alleged acts are being done. Mr. Cook, of counsel for defense, said he had declined to call Mrs. Ginsberg as he did not consider her a reliable witness—why, not stated. Another witness claims she heard "Claire" come to Mrs. Wolf some time later (after the wifey letter had been doctored) and asked her to do a favor and go up to one of her New York lawyers' office and tell him that Mrs. Ginsberg fixed the letters and not herself (Claire). So much by way of narrative. A word of comment on a few additional matters of importance.

The bill alleges in paragraph 7 that complainant is in possession of letters from deceased "referring to her approaching wedding." One letter, Exhibit 13, called in the record "coming from the west" letter, has this reference in it.

"It seems as if I have not seen you for a month, but then you have so much to do to *get set for the wedding* that time does not hang on you. It's best it does not."

This is stressed, among other things, in letter of her New York lawyer, Eisenberg, to William L. Marbury, Sr., of date April 29th, 1924, (of which hereafter).

Depositions were later taken in case fixing time of C. E. Whitehurst's western trip as being after date of alleged wedding April 9th. On witness stand, complainant on direct examination (Record, p. 280), in the early part of her direct examination, says you can tell by reading said letter *"it could not possibly refer to her marriage"* (had reference to preparation for her *sister's* wedding in May). Was complainant heading to port before the storm of cross-examination broke?

The complainant's prayerbook containing the names "Charles" and "Claire" claimed by her to have been written by Whitehurst, deceased, at the time of mutual reading of marriage service and signature thereto in apartment April 9th, 1923, in presence of Anna Stevenson, her best friend. This book was not actually produced and shown to any of her earlier New York lawyers (she having had several), until Mr. Martin, her present New York lawyer, got into the case about the middle of February, 1925. If genuine, this prayerbook with the marriage ceremony, and the name of "Charles" and "Claire" written by Whitehurst in the marriage ceremony at the place "I, 'Charles,' take thee 'Claire,' etc., for my lawful wife," was such cogent testimony that it would be almost unnecessary to have supported it with much additional facts. Yet, what do we find? The complainant working up her proof of marriage, her "wifey" letter, interviewing dressmakers, market men and maids, having a succession of lawyers from the time of Whitehurst's death in January 30, 1924, to the time of the settlement, January 9th, 1925, and not exhibited by her to a single one of them. She claims to have told her lawyer Eisenberg, about the *existence* of the prayerbook—no claim she ever told him it had Whitehurst's *signature to the contract of* marriage printed in said book. On April 29th, 1924, Eisenberg is writing to Marbury setting forth all the cogent facts of her case, on which they expect to rely to establish her claim. It is a *formal* letter, divided into five paragraphs, numbered with Roman figures, the several paragraphs sub-divided into a, b, c and d, and under each heading and each sub-division he enumerates specific pieces of evidence. Under paragraph III he

describes the wedding as taking place at the apartment April 9th, 1923, in the presence of Anna Stevenson "that he read a marriage ceremony to her and gave her a wedding ring. Mrs. Stevenson was present throughout the ceremony, they all three celebrated the marriage at a wedding dinner at the Knickerbocker Grill," etc.

Not a reference, hint or suggestion about what is *now* brought forth as the most important and, if genuine, the convincing piece of evidence in the case. The letter does not even mention a *prayerbook;* simply says "read a marriage ceremony." Mr. Marbury testified that Eisenberg, then her New York lawyer, when he came with the complainant to Baltimore to his office, did not tell him a thing about any prayerbook or any signatures in any prayerbook. (Marbury testimony, book 2, pp. 148, 149.) Even Eisenberg, in his testimony does not claim to have told Mr. Marbury anything about any prayerbook or any signatures of Whitehurst in it. Complainant never produces such prayerbook until *early in February,* 1925, to Mr. Martin's partner (Mr. Martin being her present New York lawyer, and about the sixth in order of succession).

Soon after the death of Whitehurst, when lawyer Sulzberger told her to get her papers, etc., and come with him to Baltimore to Mr. Leach, she did not bring the prayerbook down, though it was the most important piece of evidence she had, if genuine.

### The Padden Testimony.

Mr. and Mrs. Padden were theatrical agents (or Mr. Padden was), friends of Whitehurst, constant New York associates, he and wife took dinner with him and "Claire" every Tuesday in New York. Claims to have had a fifth wedding anniversary dinner Tuesday, April 10th, 1923, at which he and wife were present with Whitehurst and Claire at Mori Grill. Whitehurst proposed toast to Mr. and Mrs. Padden, afterwards Claire proposed toast to Mr. and Mrs. Whitehurst (next day after alleged marriage) and that Whitehurst called her down and said there was no Mrs. Whitehurst other than his mother, and she sulked over the call-down, further says he, Padden, was at Whitehurst apartment the whole evening the night before and no Anna Stevenson there, and no prayer-book, and no marriage service, and nothing of the sort contended for by complainant happened. He remained all evening, 12.30 or 1.30, when his wife called up to get him home early, their anniversary dinner to be the next day, and wife corroborates fact and has distant recollection of the telephone call to that effect late midnight, and talked to him there at Whitehurst's apartment around one o'clock midnight.

I may add, gratuitously, and perhaps unwisely, that my mind rejects the Padden testimony. If compelled to assign a reason for so doing, I would have to admit it was more "intuitive" and "atmospheric," than *tangible* in character. The joints are a little too nicely spliced, a little too perfect a piece of work for haphazard recollection of a busy New York theatrical man accustomed to constant association with Whitehurst in New York. Tinged with this close theatrical association, comes a natural readiness and willingness to support what they may personally believe in, and they may or may not be correct in the details of the alibi they support. I think it was Sam Weller who not only cautioned us to "beware of the vidders," but who also said a wife was a convenient thing if you should need an alibi. Between them they supply it here. They may be correct but it is not persuasive to my mind.

Anna Stevenson denies she was at the apartment at all on Monday night, April 9th, 1923, day after her arrival in New York, but a little put out with Claire for leaving her all alone at Martha Washington Hotel all evening, says four of them had dinner at Knickerbocker Grill Tuesday (April 10th), after which she went home; gives an involved account of some of the conversation in which Whitehurst asked what she thought of his and Claire's wedding and she asked what he meant and he said he and Claire were married before God, etc., in their own way. At Claire's request she had given two previous statements to her, one an affidavit, on March 7th, 1924, one a written two-page unsworn statement (said to have been May 10th, 1924), in neither of which did she ever *claim* to have been present at the ceremony of the reading of the marriage service by the parties and the signing of their names as claimed in the sworn bill and also in complainant's testimony, and later in her sworn deposition at the

time her testimony was formally taken, specifically *denied* being at the apartment at all Monday night, April 9th, but complained of being left all *alone* that night in her room at the Martha Washington. Claims Claire came to her and tried to get her to swear she was present at the ceremony, and discussed with her at her home with some of her family, and on telling her family she had not been there with Claire, they told her she could not in such case, of course, go and falsely perjure herself, her father-in-law, it seems, being a detective attached to the District Attorney's office at the town where they live, Lansdale, Pa. In many respects, other than being a witness to the marriage, Anna Stevenson corroborates much of complainant's testimony.

Pages could be filled with further and important statements of fact, but to my mind those are the high spots, and to me the basic facts from which the conclusion must be drawn by any trier of facts.

No man can tell what he would do in a given situation until he has been sorely tried. What is great temptation to one might not be even interesting to another. "Talk not of grief till thou hast seen the tears of warlike men," said the poet. While we may throw the mantel of Christian charity over much of the frailty of human nature, when it comes to attempting to enforce legal rights as such in the tribunals of justice, there are definite standards which must be applied. Judged by the laws of distribution of the estates of persons dying intestate, as applicable to surviving widows, complainant finds herself the victim of an economic convenience. The victim of ambition, blended with sentiment and sex appeal not sanctioned by the conventionalities of life, or by the laws of the land in which she built her castle of cards. As a mere trier of facts, I come *confidently* to the conclusion that the alleged marriage ceremony of April 9th, 1923, with the reading of the ritual from the prayerbook and the signing then and there by Charles and herself, did not as a matter of fact take place at all. Convinced am I, also, that the word "wifey" in the letter called "wifey" letter was not written by Charles Whitehurst.

Convinced that the complainant was not the wife of Charles E. Whitehurst in his lifetime, and that no common-law marriage or any other variety of marriage ever existed between them, it follows, of course, that the complainant is not now his widow, and, therefore, not entitled to any of the relief asked for in the bill and the bill should, accordingly, be dismissed.

Mr. Marbury, Jr., in his very able argument on the facts, analyzing the *effect* of the Court's decision either way, I think somewhat misconceives the attitude of the defense counsel toward complainant. Whatever that attitude may be outside of the Court, I perceive it only as manifested in presentation of the case here.

He says to disallow her claim as common-law wife would have the disasterous consequence to her of branding her as a "strumpet," whereas, decree adverse to Whitehurst, means no loss of reputation to them, merely a certain financial deprivation to the next of kin.

I see no such effect on complainant of decree adverse to her. But if, for sake of argument, it had such effect, it could not be controlling. If she has asserted here a legal status to which she is not entitled, *sentimental* reasons however cogent would not justify "*decreeing*" her on deceased, as his *widow*, if in fact she be not such in law.

On the contrary, I think, on this record, the complainant is as far removed from the class of "strumpet," as she is, by the rigors of a wise and just law, removed from the status of "lawful wife."

In the exercise of the judicial function of legal determination of facts, human sympathy is ever at war with judgment. I am not insensible of the conflict here. Such would be my strong and natural inclination, stimulated, no doubt, by the sentimentalities of the occasion, as well as by the codes of ethics which public opinion regards as obligatory on men of the world, even of the looser sort of morals to make provision for those whom they regard as their mistresses. Human society may have little respect for the man or his memory, who, having substantial wealth at his command, takes a young and confiding girl, less than half his age, to his apartment, for their mutual convenience, and lives with her, without the sanction of legal wedlock, and, when suddenly taken off by an unexpected death, leaves her wholly unpro-

vided for. The judgment of the world is more harsh when she is shown to be comparatively unsophisticated, with a limited education, lacking in strong religious background, without the wholesome influence of a good mother on whom to lean, but as here, on the contrary, has a mother, divorced from her father, and which mother, for some unexplained reason (unless it be semi-dementia) is intensely hostile to her daughter's interests, to the extent even of making common cause with the defendants in this case, who are shown to have used her as one of their investigators; carried around the country, at their expense, *flushing* evidence against her daughter. The mother appeared in court every day of the trial, there consorting with the defendants and their witnesses, and evidencing throughout the case, a keen interest in the proceedings—to the extent sometimes of even interjecting remarks openly in court against the witnesses on the stand; on one occasion, having to be admonished by the Court to hold her peace. The explanation to the Court of defendants' counsel for not putting her on the stand, is that they regard her as not sufficiently rational to be at all reliable as a witness. In addition to this, the record as presented, as well as the appearance of the complainant herself, including her manner on the stand, leads me to the conclusion that she had not been a girl of loose manner or morals, except for the indiscreet life she led for ten months with Charles E. Whitehurst, now deceased. During that period, with him in Baltimore *half* the week, and she in the New York apartment the *whole* of that time, I see nothing to indicate that she was not, during all of that time, true to him, fond of him and loyal to him, in the *worldly* sense.

By his sudden and unexpected death, she found herself stranded in the great and cold metropolis, denied the very apartment in which she was living, and, feeling a strong moral claim upon the man with whom she had lived for nearly a year, lacking, as stated, any stable religious background, without any special education, unsuccessful as an actress in a limited career of only a few weeks, with a meagre vocational training which put her in the $25 a week earning class; she can not, in Christian charity, be judged too harshly (however sternly her acts must be condemned by the cold logic of the law), for being willing to resort to whatever methods she deemed reasonably expedient to establish what she thought would be sufficient *legal* proof of what she had, humanly speaking, some justification for regarding as her *moral right*, according to her code of ethics.

No one but the Great Searcher of Hearts can definitely determine what she did. Such knowledge of human nature as my experience has enabled me to glean from many pages of the book of "life in the making," leads me to conclude that, when one of her many earlier New York counsel discussed with her the apparent *necessity* (in the absence of *"undivided repute"* and *"holding out,"* not satisfactorily established in this case), that an original agreement of marriage, or some mutual marriage ceremony, *witnessed by at least one credible witness* willing to testify to it, was necessary in support of the claim in the event of litigation, I think this girl of 22 did not fully appreciate the legal enormity of falsifying a situation of that character, when she had some feeling of moral justification for its fabrication. The prayer-book incident and the "wifey" letter thus come into the picture. They were, to her mind, a mere exigency of the occasion necessary to satisfy some of the legal technicalities requisite under the circumstances. It was also, humanly speaking, as applied to this complainant, natural for her to think that if a witness was needed to gratify the legal requirements, the thing to do was to call upon her nearest and dearest friend, Anna Stevenson, and hence she gave Anna's name to the lawyer as having played the role of witness to the fictitious ceremony. Having so furnished the name, the next step, as shown by the evidence, was to go to the home of her dear friend, Anna, to tell her she had given the lawyer her name as having been present at the apartment April 9th, when she claimed she and the deceased read the ritual out of her Catholic prayerbook in the presence of said Anna Stevenson, which, in my opinion, never happened, and is a mere creature born of the seeming legal and technical necessities of the case.

This being my conclusion, I take it that it will be unnecessary to prolong this rather fragmentarily patched together lot of notes on a most volumi-

nous record, or to rule separately and distinctly on the several exceptions filed by counsel for defense to the various pieces of evidence. I would, however, if it became necessary to so decide, admit the testimony of the complainant, coming as it does with all its attendant infirmities created by the sealing by death of the lips of Whitehurst.

The Evidence Act of Maryland under which the testimony of complainant is asked to be excluded is predicated on the assumption that Mrs. Taylor, the mother of the Whitehurst brothers, is sued as "distributee." It may be but a "legal fiction" to say she is not sued as distributee; namely, that she took as "distributee" as to the other portions, but as to the one-half in controversy, contended for by the complainant as the widow's half, she is in possession of this not as "distributee" but as *assignee*, because, under the New York settlement by quit-claim deed of assignment of Claire J. Ulrich (in the event she was the legal widow of Charles E. Whitehurst), defendant became assignee and that, therefore, she is sued not as *distributee* but as *assignee*.

It may be said that this is a subtle and narrow distinction. It is also a subtle and narrow statute, requiring subtle and narrow distinctions to support it as well as evade it. However narrow the distinction or subtle the reasoning, the ingenuity for the device must be accredited to the learned counsel for the complainant, and not to me. I merely *accept* the distinction, which counsel have discovered. I do so partly because I have little sympathy with the rule, and think it more often does injustice than justice, of which I think this case would have been a typical illustration, and partly because no one, certainly not this Court, could have had any *satisfaction* in determining this controversy, without having had the benefit of the testimony of the complainant as to her contention.

Furthermore, this is a *technical Act*, so technical, that although there have been more than a hundred decisions of the Maryland Court of Appeals on it, nisi prius judges at least do not always know when it should be applied. I thought this would be a most splendid occasion to get some further exposition of it.

The New York Evidence Act, of a similar character, is only fourteen lines, but has been to the New York Court of Appeals over 350 times, and is still only law in the making.

Exceptions to some of the other testimony, on purely technical grounds, may well be sustained. Had I been able to find from this record that complainant was in fact the legal *wife* of Charles E. Whitehurst in his lifetime, I would have no hesitation whatever in setting aside the so-called deed of assignment which she was persuaded by Ascher and Walsh to execute. The manner of the settlement, the withholding of the information as well as the non-division of the money with the legal associates in the case, the manifest evasive character of Ascher's answer in the New York Courts, filed as exhibit here, are so far incompatible with the traditions of the practice of the profession of law as to cause a Court of equity and conscience to strike it down.

As to the highly technical but fascinatingly interesting legal proposition of what are essentials of a common law marriage under the laws of New York, and on which there is a conflict of expert testimony here between the former Chief Judge of the Court of Appeals of New York and Mr. Benjamin Matthews, called by the complainant, it is only fair to Judge Hiscock's testimony to say that he was not categorically asked the question, namely, "given a definitely evidenced agreement between two competent parties, to take each other as husband and wife '*co instanti*' would that constitute matrimony in the State of New York, or would it also require as a legal essential, the additional elements of cohabitation plus repute or the holding out as man and wife?" I did ask Mr. Matthews that question (page 66 of the record) and his answer is that the definitely established proof of such agreement alone is sufficient, when established, without cohabitation and without repute, that they are generally the *evidential* facts establishing the existence of the agreement. My finding, on the authorities, were it necessary for the purpose of this case to make a legal finding, would be in accordance with the opinion expressed by Mr. Matthews in his testimony. The analysis of the New York cases prepared in brief form by Mr. William L. Marbury, Jr., and William R.

Semans as an exhibit, I think is convincing on that point. It may be said, however, that there is not a single New York case in which that *exact question* has even been presented. The 200 page printed book submitted by Mr. Vernon Cook and Mr. Veazey, every page of which I have read (Koegel on Common Law Marriage), confirms that view, in my mind at least. Nowhere do I find the answer to the proposition more cogently expressed than on page 128 of said volume, from which I quote certain paragraphs:

"No one could say that reputation of marriage was any part of the marriage for the simple reason that there could not be a rightful reputation of marriage until after the marriage; and so cohabitation is not a part of the marriage, for it can only lawfully exist *after* the marriage.

"If only copula were required in addition to consent we would be recognizing the ancient doctrine maintained by Gratian and other canonists in force prior to the Lombardian distinction and this would be difficult to defend on principle. The dicta of the cases go much farther, however. The cases purport to require cohabitation, which presupposes not one but perhaps many acts of copulation. A doctrine that requires two persons to fornicate a number of times before they create a legal status is absurd. Must they live together as husband and wife before they are husband and wife and this too in the face of a provision of the criminal law that persons who do this without first being married are guilty of a crime? Again, just where will the line be drawn? When do the parties cease to be fornicators and just when does the sublime institution of matrimony begin?"

Page 129:

I am in entire accord with the following conclusion of this same writer:

"If a mutual agreement in fact is clearly established by direct evidence, neither holding out nor cohabitation is necessary to constitute the parties husband and wife. While these circumstances are of considerable probative force in establishing consent, they are not its essential concomitants."

And on page 164 the author has tabulated the various States of the Union; first, those validating marriage by "*verba de presenti*" without cohabitation; second, those validating marriage "*per verba de presenti*," plus cohabitation; third, those "*per verba de futuro, cum copula*"; and he classifies New York under the first heading, "*per verba de presenti*" without cohabitation, and therefore, necessarily, without repute.

Of perhaps little more now than of mere historic interest is the fact that in our own State we have the first *reported* law case in this country involving questions of *common law marriage.*

(1739) Cheseldine's Lessee vs. Brewer, 1 H. & McH., p. 152; (later overruled by Dennison vs. Dennison, 35 Md. 361).

Neither the old canon law (from which comes much of our modern law of marriage), nor the civil law of the States in which common law marriages are regarded as valid, where satisfactorily established, looks with much favor on *secret marriages,* Sorenson vs. Sorenson, 68 Neb. 438 (cited in Koegel on Common Law Marriage at p. 113, as follows):

"This ancient doctrine is alien to the ideas and customs of our people. It tends to weaken the public estimate of the sanctity of the marriage relation. It puts in doubt the certainty of the rights of inheritance. It opens the door to false pretenses of marriage and the imposition upon estate of supposititious heirs. It places honest, God-ordained matrimony and mere meretricious cohabitation too nearly on a level with each other. In view of these consequences, that are apparent to all, it seems to us that grave considerations of public policy require us to closely scrutinize the testimony offered and proof adduced in support of every common-law marriage alleged to have been consummated in this State."

Again, on p. 114 Koegel (from third rehearing of same case):

"Our marriage laws aim at publicity. To allege that these laws have been disregarded, and that a secret marriage has been entered into, is to cast suspicion upon the conduct of the parties. Subsequent cohabitation, and holding each other out to the world as husband and wife furnish strong corroboration of the existence of the contract. *Where these elements of proof are wanting, and, one party being deceased, the existence of the contract rests wholly upon the unsupported testimony*

*of the other party, the presumption raised by the circumstances amounts to proof opposed to the marriage contract itself.* We do not think that the evidence of this witness is so direct, certain and consistent as to establish the contract of marriage in the face of this presumption."

After conclusion of argument Friday some time late on Saturday Mr. Marbury, Jr., filed additional authorities in support of the argument made and cases referred to in support of the proposition that *both* parties need not *intend matrimony*, but sufficient in law, if one party intends it, and the other party *makes believe* he intends it, and if seduction is thus accomplished, he who copulated with such mental reservation is estopped from so contending, against the belief of the confiding party.

The deceased in this case was referred to in oral argument as an *"experienced seducer"*—from the fact that he had two mistresses in succession at this same apartment, anti-dating April 9th, 1923, when complainant claims to have first gone there.

I think the cases sustained the legal proposition, one of them speaks of "blundering into matrimony."

Such a situation, however, is not sustained by the evidence in this case. Even were there any such evidence, I do not think this complainant could now shift to such contention, in view of the definite and clear cut, sworn allegations to the contrary in her bill of complaint, part of paragraph 7 being as follows:

"Your oratrix further alleges that both said Charles E. Whitehurst and your oratrix fully intended that the ceremony and making of the mutual promises hereinbefore described should constitute them husband and wife and that *both of them* understood and believed that the same did have that legal effect and that the marriage so celebrated and entered into between them was in all respects a complete, valid and lawful marriage. And your oratrix further charges that not only was this the belief, understanding and intention of *both* said Charles E. Whitehurst and your oratrix, but that said belief and understanding was correct." (Italics mine.)

Wherefore the bill should be dismissed.